**AMERICAN SAMOA GOVERNMENT, Plaintiff,**

**v.**

**SELINA ROPATI, Defendant.**

High Court of American Samoa
Trial Division

CR No. 27-02

February 27, 2003

Before RICHMOND, Associate Justice, TUPUIVAO, Associate Judge, and MAMEA, Associate Judge.

Counsel: For Plaintiff, Frederick J. O'Brien, Asst. Attorney General
For Defendant, Bentley C. Adams III, Asst. Public Defender

ORDER DENYING MOTION FOR
RECONSIDERATION OR NEW TRIAL

On October 10, 2002, a jury found the defendant Selina Ropati ("Ropati") guilty of murder in the second degree. Ropati moved for reconsideration or new trial, arguing in essence that: (1) in order to prove Ropati's guilt, plaintiff American Samoa Government ("ASG") relied

entirely on her incriminating written statements to the police that should have been excluded from evidence as illegally obtained; (2) without the incriminating statements, the evidence was insufficient to prove guilt beyond a reasonable doubt; and (3) in any event, the court should exercise its discretion to grant a retrial in a close evidentiary case.

## Factual Background

The following relevant evidence was adduced at trial. During the evening of May 8, 2002, Ropati's neighbor, Savea Pulu ("Savea") heard noises outside his house. As he checked, he saw someone walking in a darkened area and heard a baby cry for perhaps two or three minutes. He and Sani Ala`ia ("Sani"), another neighbor, looked in the area behind their houses but did not find a baby. His wife, Sefulusene Pulu ("Sene"), looked for a baby the next morning, May 9. Sene did not find a baby, but she did see the bloody floor in the outside bathroom used by Iakopo Gaisoa and Omeka Gaisoa ("the Gaisoas"), with whom Ropati had been living.

During the afternoon of May 9, Sene asked Ropati about a baby. Ropati told her that she gave birth standing up in the outdoor bathroom, the baby fell to the concrete floor, and she buried the baby nicely in the plantation area of the neighborhood. After Savea and Sani returned home from work on May 9, Savea also asked Ropati about the baby, and Ropati showed him, Sani, and Sene the location of the baby's body; it was in a sack, partially hidden among rocks, in the bush area behind the houses. Sani removed and cleaned the female baby's body, and covered the body in a clean sheet. The baby's umbilical was still attached and partially wrapped around the baby's neck. Sani cut the end of the umbilical cord to remove it from the baby's neck. The police were contacted.

From the time of the baby's birth until Sene asked her that day, Ropati did not say anything to anyone about the baby's birth or death. Police Sgt. Kilisitina A. Simanu ("Sgt. Simanu") was at the scene of the baby's death during the evening of May 9. Not then suspecting any foul play, she did not put Ropati in any form of custody, but did ask her what happened. Ropati told her the baby was born dead in the outdoor bathroom, and pointed to the unlit area where she put the body. Sgt. Simanu did see the blood on the bathroom floor.

Sgt. Simanu took Ropati to the LBJ Tropical Medical Center for examination. They talked at the medical center while waiting for the examining doctor. Sgt. Simanu believed that she and Ropati were getting along with each other, and though Ropati seemed reluctant to talk, she did answer questions. Ropati told Sgt. Simanu that she was unhappy with her live-in companion in Samoa because he had gone to

New Zealand leaving her while she was pregnant. She came to American Samoa to live with the Gaisoas, but was too embarrassed to tell them her condition. Ropati also said that on May 8, she felt birth pain during an afternoon Bible study session and returned to the Gaisoas' home where the pain increased until she gave birth. The doctor then came and examined Ropati in Sgt. Simanu's presence. After the examination, Sgt. Simanu thought that Ropati appeared weak and arranged for Ropati to stay overnight at the medical center.

The following day, May 10, Sgt. Simanu again saw Ropati at the medical center. She asked Ropati to write a statement about the circumstances of giving birth. Ropati agreed and Sgt. Simanu gave her two or three police statement forms for this purpose. She told Ropati that she would be back later that day, but if Ropati was then released from the medical center, she would come to Ropati's home at a later time to pick up the statement.

This led to the situation on May 13, 2002, when Sgt. Simanu obtained Ropati's written statement at the main police station in Fagatogo. Ropati admitted in the statement that when the baby was born, she choked the baby to death. Sgt. Simanu was totally unaware that asphyxiation may have been the cause of the baby's death. Indeed, the autopsy establishing asphyxiation as the cause of death was not performed until May 16, 2002, three days later. Sgt. Simanu did not have any information indicating that Ropati may have strangled the baby or any reason to suggest to Ropati that she had killed her baby by any particular means.

At trial, Roel B. Cayari, M.D. ("Dr. Cayari"), testified. He is a pathologist and performed the autopsy of the baby's body on May 16, 2002. According to him, the female baby was born alive, full-term. He did not find any significant abnormalities, except bleeding from small ruptures in the lungs and hemorrhage on the left scalp side of the forehead. He testified that the scalp injury may have been caused, for example, by contact with Ropati's pelvic area during birth or a fall after birth, but it was in no event the cause of death or a contributing factor.

Dr. Cayari established asphyxiation as the cause of death, but he could not determine whether this was due to a natural or unnatural cause. He also added that if the baby had been strangled, visible evidence of injury to the child's neck would be expected. However, this was not always the case. He confirmed that no visible injury was present here. In all, Dr. Cayari's testimony showed that death by unnatural asphyxiation was a possibility.

## Discussion

## A. Illegally Obtained Statements

■ Ropati asserts that her confession to the police was illegal because it was fruit of a poisonous tree, to wit, an illegal arrest. We will suppress a defendant's confession if it was obtained after police effectuated an illegal arrest "unless the causal connection between the arrest and the confession had become so attenuated that the latter should not be deemed 'tainted' by the former." *Am. Samoa Gov't v. Sefo*, 21 A.S.R.2d 32, 34 n.1 (Trial Div. 1992) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). In this case, however, suppression is not necessary as our factual findings, which we do not deem to be clearly erroneous, show that Ropati was not in fact under arrest.

■ The evidence at trial adduced during ASG's case-in-chief and at the pretrial suppression hearing showed that, contrary to Ropati's contentions, she was asked to go to the police station and make a statement and she voluntarily acquiesced. She was further advised that she was not under arrest and she was free to leave whenever she chose to do so. While at the station, she was once again advised that she was not in custody and was free to leave at any time. Though the police questioning took place at the police station, that factor alone does not convert an otherwise volitional act into an arrest. *See Am. Samoa Gov't v. Afamasaga*, 17 A.S.R.2d 145, 148-49 (Trial Div. 1990) (defendant who voluntarily accompanied officer to station was not under arrest).

Additionally, we do not find clear error with our factual findings that Ropati voluntarily waived her Miranda rights and knowingly and intelligently gave a statement.[1] Even after hearing the evidence at trial, there is no merit to Ropati's claims that she was coerced by physical and verbal threats. Furthermore, as will be discussed, we find that the statement itself is trustworthy. In light of this, we affirm our earlier ruling that the statement need not have been suppressed.

## B. Sufficiency of the Evidence

---

[1] The fact that Ropati received *Miranda* warnings does not change our determination that Ropati was not under arrest. *Miranda* warnings are necessary when someone is in police custody. *See Am. Samoa Gov't v. Fealofa'i*, 24 A.S.R.2d 10, 11 (Trial Div. 1993). Nevertheless, it is possible to be in custody, for purposes of *Miranda*, yet not under arrest, for purposes of AM. SAMOA. REV. CONST. art. I § 5 and U.S. CONST. amend. IV. *See United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993); *United States v. Corral-Franco*, 848 F.2d 536 (5th Cir. 1988) (discussing the different tests for determining whether a suspect is in custody or under arrest). *Cf. United States v. Perdue*, 8 F.2d 1455 (10th Cir. 1993) (discussing necessity of *Miranda* warnings in context of a *Terry* stop).

Ropati argues that even if the written incriminating statements are not suppressed, ASG failed to carry its burden of proving guilt beyond a reasonable doubt. On this point, she apparently seeks ·a complete acquittal and discharge, rather than merely a new trial.[2] Enmeshed in this argument is an additional challenge that it was impermissible to use the incriminating statements as substantive evidence of the crime without any corroboration.[3] Unquestionably, ASG's most crucial piece of evidence was Ropati's incriminating statements to the police. She essentially confessed to killing, by strangulation, her newborn child. Without Ropati's statements, the evidence was clearly insufficient to find Ropati guilty beyond a reasonable doubt. On the other hand, with her statements, the evidence was sufficient to find her guilty under this standard.

Courts, for various reasons, have long been wary of a criminal justice system that relies on confessions as the sole evidence of guilt. *See generally Escobedo v. Illinois*, 387 U.S. 478, 488-90 (1964); *Dickerson*, 163 F.3d at 641; *U nited States v. Singleterry*, 29 F.3d 733, 736-37 (1st. Cir. 1994); *United States v. Lopez-Alvarez*, 970 F.2d 583, 589 (9th Cir. 1992). Accordingly, courts have adopted protective measures. Incriminating statements of this nature are not admissible evidence "in the absence of 'substantial independent evidence which would tend to establish the trustworthiness of [the] statement.'" *Singleterry*, 29 F.2d at 737 (quoting *Opper v. United States*, 348 U.S. 84, 93 (1954)); *see also Smith v. United States,* 348 U.S. 147 (1954); *United States v. Calderon,* 348 U.S. 160 (1954); *United States v. Dickerson*, 163 F.3d 639 (D.C.Cir. 1999). Corroborating evidence can come in the form of either "independent proof of the commission of the charged offense [or] 'independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused.'" *Singleterry*, 29

---

[2] Ropati's motion as one for an acquittal based on insufficiency of the evidence is, in essence, a motion for a judgment of acquittal pursuant to T.C.R.Cr.P. 29(c). Rule 29(c) Motions requires a judgment of acquittal to be made, at the latest, "within 7 days after the jury is discharged." Ropati's motion in this context is therefore untimely. *Id. But see infra,* note 3 (discussing why we are still addressing her argument).

[3] Further complicating the matter is the confusion as to whether the corroboration requirement is a rule of admissibility/evidence or "a rule governing the sufficiency of the evidence." *United States v. Dickerson,* 163 F.3d 639, 642 (D.C. Cir. 1999). We think it is more meaningful to frame the issue as one of evidence, and will treat it as such. Thus, this claim is properly before us. But, because we find that the confession was properly corroborated, the result would be the same regardless of how we classify her claim (and even had her motion for acquittal been timely).

■ Independent evidence that someone committed an alleged crime is the traditional minimal means of corroboration permitting admission of a defendant's incriminating statements. *Shunk*, 881 F.2d at 919. In this respect, ASG's evidence, other than Ropati's incriminating statements, is equivocal. The circumstances in evidence are subject to reasonable interpretations. In the absence of congenital defects or signs of illness, the baby's death appears to have been either accidental or homicidal. Nonetheless, the latter interpretation is plausible if coupled with other significant indications of the trustworthiness of Ropati's incriminating statements, which would provide sufficient corroborative evidence for admission of those statements to the jury.

Sgt. Simanu obtained Ropati's incriminating statements on May 13, 2002, three days before Dr. Cayari performed the autopsy establishing asphyxiation as the cause of the baby's death. On May 13, Sgt. Simanu did not have any information or reason to suggest to Ropati that she had killed her baby by strangulation or any other particular means. The result of the autopsy—death caused by asphyxiation, possibly by unnatural means—lends credence to Ropati's acknowledgement three days earlier of choking the baby to death. These facts tend to confirm the trustworthiness of Ropati's incriminating statements.

In conclusion, we were, and still are, satisfied that the evidence presented by ASG, outside of Ropati's incriminating statements, sufficiently corroborated those statements for purposes of introducing the statements into evidence for the jury's consideration. The jury, as the trier of fact, had before it proper and substantial evidence to determine whether or not Ropati was guilty of the homicidal death of her

---

[4] The test for corroboration we are adopting is what seems to be the test used by the majority of federal courts. As noted, this test allows corroboration to be shown in either of two ways: through some evidence that the crime occurred, often referred to as the *corpus delicti* rule, or through evidence which bolsters the confession itself. *See Singleterry*, 29 F.3d at 737; *United States v. Jacobs*, 97 F.3d 275, 283 (8th Cir. 1996) (independent proof of injury caused by criminal act enough standing alone); *United States v. Shunk*, 881 F.2d 917 (10th Cir. 1989); *United States v. Micieli*, 594 F.2d 102, 108-09 (5th Cir. 1979) (bolstering admission with independent evidence is sufficient corroboration); *United States v. Bukowski*, 435 F.2d 1094, 1106-07 (7th cir. 1970); *United States v. Marcus*, 401 F.2d 563, 565 (1968). *But see United States v. Lopez-Alvarez*, 970 F.2d 583, 589-93 (9th Cir. 1992); *see also Singleterry*, 29 F.3d at 737 n.2 (noting that many states "adhere to a more traditional formulation.").

baby. The jury's determination of Ropati's guilt beyond a reasonable doubt was supported by sufficient evidence.

## C. Close Case Discretion

 Finally, characterizing the evidence as creating a close case, Ropati asks that we use our discretion to grant a new trial in a close case. In reviewing a motion for new trial, we have broad power to grant relief. 3 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 2d § 553 (2d ed. 1982). It is within our discretion and we "may weigh the evidence and consider the credibility of the witnesses." *Id*. This case may be classified as closer than many criminal prosecutions, at least but for Ropati's incriminating written statements. However, because we have found there to have been no legal errors, we see no reason to grant the motion. *See Am. Samoa Gov't v. Snow*, 26 A.S.R.2d 78, 80 (Trial Div. 1994) (New trial granted only if it is in the interest of justice).

## Conclusion

For the reasons stated above, Ropati's motion for reconsideration or new trial is denied.

It is so ordered.