[No. A105503. First Dist., Div. One. Jan. 20, 2005.]

In re I. M., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
I. M., Defendant and Appellant.

---

**COUNSEL**

Irma Castillo for Defendant and Appellant.

Bill Lockyer, Attorney General, and Christopher Grove, Deputy Attorney General, for Plaintiff and Respondent.

---

**OPINION**

**STEIN, J.**—On July 11, 2003, a Welfare and Institutions Code section 602 petition was filed against defendant I. M., then 15 years old, alleging that he had acted as an accessory after the fact in connection with a murder. (Pen. Code, § 32.) The petition also contained the enhancing allegation that defendant had committed the offense with the specific intent to benefit, promote, further or assist the unlawful conduct of a criminal street gang. (Pen. Code, § 186.22, subd. (b)(1).) The juvenile court found the petition's allegations to be true, placed defendant on probation, and committed him to the Orin Allen Youth Rehabilitation Facility for 270 days. In addition, as a further condition of probation, the court ordered defendant to pay $15,184.43 in restitution to cover the expenses for the victim's funeral.

This appeal followed.

EVIDENCE

*Evidence of Shootings and Defendant's Arrest*

Thomas B. testified that on June 4, 2003, he and his friend Jorge H. were hanging out in a park, talking and drinking. At some point, several people came up to them to talk in a friendly manner and shake hands. At about 8:00 p.m., they left their bottles at the bench, or threw them away, and began to walk through the park to a store. Thomas noticed two individuals running, or walking quickly, towards them. Thomas heard someone talk or yell something in Spanish. One of the individuals, later identified as Victor C., said something along the lines of "Sur Trece," and put up his hands as if he wanted to fight. The two individuals moved together. Victor pulled a gun

partway out of a backpack. Thomas said something along the lines of "What, you can't fight like a man, one on one?" Victor responded by pulling the gun all the way out of the backpack and shooting Thomas, hitting him in the arm. Thomas and Jorge turned and began to run, Jorge right behind Thomas. Thomas looked back. Jorge was lying on the ground and Victor and the other individual, defendant, were running side-by-side out of the park.

On the evening of June 9, Detective Eric Nilsson was involved in a forced entry into Victor's residence, a trailer, where he found defendant, Victor, and another young man. Police found a number of articles of clothing, writings, and other items suggesting an affiliation with the Sureños 13 street gang, including a notebook bearing the words "Ese Queso Varrio Sur Trece Richmond" and a drawing of a block of cheese with a flag on which was written "X13."

Victor admitted that he did the shooting. He told the police that Thomas walked by him and gave him a dirty look. Victor pulled out his gun and said, "Sur Trece 13 here, fool." Thomas said, "What?" and Victor responded, "What, are you a chapete?"[1] Thomas threw down his 40-ounce bottle of alcohol and challenged Victor to a fight, reaching his hand toward his waistband. Victor then pulled out his gun and fired twice towards Thomas. Victor at first said that he shot Jorge after Jorge rushed him, but later stated that he shot Jorge in the back after Jorge tried to run.

*Defendant's Statements*

Defendant at first gave the police a false name, telling them his true name only after Detective Nilsson told him that there was no record of anyone with the first name he gave. Defendant told the police that he used the false name because he was afraid that he was going to be arrested for his tattoos and wanted to avoid prosecution.

Defendant stated that he had been sitting with some friends at the park. Thomas and Jorge, who defendant believed to be Norteños, walked up, said hello, and moved on. Victor arrived a short time later, seeming to be upset that defendant had been speaking with Thomas and Jorge. Victor yelled "fucking chaps" at Thomas and Jorge. Thomas and Jorge walked towards Victor. Thomas was in the lead, and was carrying a 40-ounce glass bottle in his hand. Victor walked toward the other men. Thomas threw the bottle onto the ground, and reached into his waistband area as if to pull out a gun. Victor pulled a gun out of his backpack and fired two or three shots at Thomas, who ran off. Jorge, who had not run, raised his hands, saying, "Hey, I have no

---

[1] The terms "chapete" or "chap" are derogatory terms for members of rival gangs.

problem," turned around and started to walk away. Victor then fired one to two shots into Jorge's back. Defendant had a pellet gun in a bag that he was carrying, but he never pulled it out.

Defendant and Victor ran out of the park together. Victor handed the gun and the backpack to defendant. Defendant put the gun in the backpack and ran with it. They reached a parking lot, where Victor grabbed the backpack, pulled out the gun and pointed it at someone who was following them, saying, "Get back" or "You want some?" Defendant and Victor ran off in different directions. Defendant went to Victor's trailer. Victor showed up about 30 minutes later.

Defendant admitted that he was a member of the Sureño gang, explaining that he belonged to the Richmond Sur Trece subset of that gang, and that his gang nickname was "Queso." Victor belonged to the Mexican Locos, another subset of the Sureño gang that got along with the Sur Trece gang. Defendant told the police that he felt a close, brother-like relationship with fellow gang members.

*Physical Evidence*

The physical evidence was inconsistent with the statements by defendant and Victor that suggested that Thomas acted in a threatening manner by throwing down his beer bottle and reaching towards his waistband. The only bottle found in the general area was a plastic soda bottle which police collected from a picnic area approximately 20–25 feet away.

*Evidence of Street Gang Culture and Habits*

The prosecution's theory was that both Victor and defendant were members of the Sureño street gang, and that the shootings were gang related. Harold Keck, a Contra Costa County probation officer and an expert on the culture and habits of criminal street gangs, testified in support of this theory. Officer Keck explained that the number 13, or the word "trece," is an identifier used by the Sureño street gang. The Sureños also identify with the color blue or some other dark color. Mexican Loco (ML) and Richmond Sur Trece (RST) are subsets of the Sureños, and it is not unusual to find ML's and RST's together.

Violence is a primary activity of the Sureños 13. Violent acts demonstrate the strength of the gang, and members will commit violent acts as a means of obtaining "stripes," which signify status within the gang. In order to earn a stripe, a member not only has to commit a violent act, but has to commit it in the presence of another gang member. The other gang member is supposed to

provide assistance to the member committing the violent act, and is supposed to do whatever he can to prevent the offender from being criminally prosecuted for the offense. A member gains respect within the gang by lying to the police, fabricating defenses, misidentifying people, hiding evidence or aiding in the escape of a gang member who commits a crime.

Officer Keck stated his opinion that defendant is a member of the Sureño 13 gang, basing that opinion on defendant's tattoos, his associations and his statements. The notebook recovered from Victor's trailer indicated that the owner identified himself as "queso," or "cheese" and as a member of the Sureño 13 gang.

*June 9 Incident*

On June 9 (the same day that defendant and Victor were arrested), Detective Nilsson was in an unmarked vehicle near a market in San Pablo, when he noticed a wall with red graffiti painted over with blue and black graffiti. The blue and black graffiti included the number 187, the words, "kill a slob,"[2] "sur 13," "187 on Chaps" and "ML." Three Hispanic males, wearing blue, were walking on the side of the street across from the wall. Two black males were walking on the same side of the street as the wall. They started looking at the graffiti. The Hispanic males held up their hands with one finger showing on one hand, and three on the other, and started yelling "Sur Trece" and "slob." Detective Nilsson approached. Two of the Hispanic males ran off. Detective Nilsson made contact with the third. As they were speaking, defendant approached, asking, "Why are you messing with my homeboy?" Defendant gave the detective a false name and birthdate. He had "RST" tattooed on his left hand, and told the detective that he had been a Sureño for about three years.

DISCUSSION

**I.**

**Corpus Delicti**

Defendant contends that his conviction violates the corpus delicti rule.

"Distilled to its essence, the corpus delicti *rule* requires that the prosecution establish the corpus delicti of a crime by evidence independent of the defendant's extrajudicial inculpatory statements before he or she may be held to answer a criminal complaint following a preliminary examination, be

---

[2] The term "slob" also is a derogatory term for a member of a rival gang.

convicted of an offense, or hear the statements repeated as evidence in court. [Citation.] The corpus delicti in turn consists of at least slight evidence that somebody committed a crime." (*People v. Ochoa* (1998) 19 Cal.4th 353, 450 [79 Cal.Rptr.2d 408, 966 P.2d 442].) The rule in California is that the prosecution cannot meet its burden of proving the corpus delicti of a crime by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169 [119 Cal.Rptr.2d 903, 46 P.3d 372].) Appellate courts, therefore, have entertained direct claims that a conviction cannot stand because the trial court lacks independent evidence of the corpus delicti. (*Id.* at p. 1170.)

Defendant here was charged with the crime of being an accessory after the fact to a murder committed by Victor, a crime that required the prosecution to prove that after the murder had been committed, and with knowledge of Victor's wrongful conduct, defendant harbored, concealed or aided Victor with the intent that Victor might avoid or escape from arrest, trial, conviction or punishment.[3]

Defendant does not dispute that evidence apart from his extrajudicial statements adequately established that he and Victor belonged to subsets of the Sureño 13 street gang, that Victor shot Thomas and Jorge, and that he knew that Victor had shot both victims. He correctly points out, however, that his own inculpatory statements are the only evidence that he accepted the backpack, placed the gun in it, and carried it until Victor took it back in order to remove the gun and threaten a witness. It follows that the corpus delicti rule would not allow defendant's conviction to stand on that evidence, and if this were the only evidence that defendant sought to aid Victor after the shootings, the court's finding of defendant's guilt could not stand. There is, however, other evidence.

■ A person may aid, or attempt to aid, the principal to a crime by making false or misleading statements to the authorities, and such conduct will support a conviction of accessory after the fact. (E.g., *People v. Duty* (1969) 269 Cal.App.2d 97, 104 [74 Cal.Rptr. 606].) Here, the evidence supports a finding that defendant was attempting to protect Victor by misrepresenting to the police that Victor began to shoot only after Thomas had thrown down a beer bottle and reached towards his waistband.

■ It is true that the evidence of defendant's attempt to mislead police is in the form of a statement made by him to the investigating officers.

---

[3] Penal Code section 32 provides: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

Defendant's statement, however, was not a description of the corpus delicti. As an attempt to mislead, the statement *itself* was a part of the corpus delicti. Statements that, although extrajudicial, are themselves a part of the conduct of the crime, are not subject to the corpus delicti rule. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 394 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Defendant's attempt to mislead police, therefore, can be used to establish the corpus delicti of his crime.

■ In addition, there is evidence, albeit inferential, that defendant was present during the shootings in order to support a fellow gang member, to aid his escape and to report his violent conduct to the gang. "The independent proof [of corpus delicti] may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. [Citations.] There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency." (*People v. Alvarez, supra,* 27 Cal.4th at p. 1171.) Here, the evidence of gang habits or culture, together with the evidence of defendant's membership in the Sureños and the evidence that he approached the victims with Victor and ran away with Victor after the shootings, permits an inference that defendant, as a member of the Sureños, acted with the purpose and intent of aiding and supporting Victor both during the crimes and after the crimes were completed.

Defendant cites *U. S. v. Lopez-Alvarez* (9th Cir. 1992) 970 F.2d 583 (*Lopez-Alvarez*), where the Ninth Circuit found that the defendant's involvement with a criminal enterprise in general, and his presence when the police confronted Rafael Caro-Quintero, the head of the enterprise, at an airport, did not provide evidence that the crime of accessory after the fact had occurred. The present case is distinguishable. In *Lopez-Alvarez,* the evidence was that the defendant was present during the confrontation not because of any connection with Caro-Quintero, but because he was a member of the Mexican state police and had been sent to the airport as part of his police duties. He neither arrived nor left with Caro-Quintero, and there was no evidence that he attempted to signal Caro-Quintero during the confrontation or to in some other way provide any assistance to him. Defendant, in contrast, accompanied Victor as Victor approached the victims. He stayed while Victor fired the shots, and he then left with Victor. In addition, there was evidence that defendant's relationship to Victor as a fellow Sureño charged him with the duty of aiding Victor both in committing acts of violence and in escaping the consequences of those acts. The evidence of corpus delicti, although slight, was greater than that in *Lopez-Alvarez,* and was enough to establish a prima facie showing that the crime of accessory after the fact took place.

## II.

## Sufficiency of the Evidence

■ Defendant contends that irrespective of the applicability of the corpus delicti rule, the evidence was insufficient to support the trial court's finding of guilt. Against such a contention, we review the whole record in the light most favorable to the judgment, and presume every fact reasonably deducible from the evidence in support of the judgment. (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].) We uphold the conclusions of the trier of fact if they are supported by substantial evidence, meaning evidence that is reasonable, credible and of solid value. (*Id.* at pp. 576, 578.) Those conclusions can be supported by circumstantial evidence as well as by direct evidence. (*In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 996 [279 Cal.Rptr. 236] (*Nathaniel C.*).) ■ In addition, once the necessary quantum of evidence is present to satisfy the corpus delicti rule, the defendant's extrajudicial statements may be considered for their full value to strengthen the case on all issues. (*People v. Alvarez, supra,* 27 Cal.4th at p. 1171.)

Defendant is correct that the evidence he acted as an accessory after the fact is not overwhelming, and is consistent with his claim that he acted only to protect himself. The issue, however, is not whether the evidence supports a finding of innocence, but whether it supports a finding of guilt. Defendant casts himself as an innocent bystander, who was taken by surprise when his fellow gang member began to shoot. Defendant, however, approached with Victor while Victor was yelling or saying "Sur Trece." Instead of staying to render aid to the victim, defendant ran away, suggesting knowledge of guilt and fear of apprehension. When he ran, he ran with Victor, from which it can be inferred that he was not simply trying to distance himself from the crime, but was intending to help Victor escape. Defendant accepted the backpack and the gun from Victor and concealed the gun in the backpack. It can be inferred that defendant was acting on Victor's behalf by hiding the weapon and by switching identifiable objects from Victor to himself as a means of confusing witnesses. It makes no difference whether defendant took the gun and backpack from Victor, as the prosecution suggested, or whether Victor thrust them at him. Either way, defendant accepted the weapon and hid it, and carried it until Victor took it back.

■ In addition, while it is true that defendant's statements to the police that Victor shot Jorge in the back were not exculpatory, defendant's claim that Thomas acted as the first aggressor could be viewed as an attempt to show that Victor shot under heat of passion, or that Victor thought he was acting in self-defense. It is not required that an accessory's attempt to aid the principal be effective or well thought out. It is enough that there is evidence of an intent to aid.

Substantial evidence supports defendant's conviction of acting as an accessory after the fact.

## III.

### Gang Enhancement

■ Penal Code section 186.22, subdivision (b), requires an enhancement when the defendant is convicted of a crime "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." In order to subject a defendant to the enhancement, the prosecution must prove, among other things, that the gang includes members who either individually or collectively engaged in a pattern of criminal activity by committing, attempting to commit or soliciting two or more predicate offenses during the statutorily defined period (at least one offense committed after September 26, 1988, and the last of the offenses committed within three years after a prior offense), by two or more persons, committed on separate occasions. (Pen. Code, § 186.22, subd. (e); *People v. Gardeley* (1996) 14 Cal.4th 605, 616–617 [59 Cal.Rptr.2d 356, 927 P.2d 713].) It is not, however, necessary to show that the predicate offenses themselves were gang related. (14 Cal.4th at pp. 621–623.)

The prosecution relied largely on the testimony of Probation Officer Keck, the expert on street gang culture and habit. Officer Keck's testimony was based on police reports. He explained that one police report described the December 25, 2002 shooting of a man driving down a street in central Richmond, looking for his dog. Mr. Keck testified that "it appears" that a member of the Sureño 13 gang, with a street name of "Monstro," "was in fact the shooter." Officer Keck believed that Monstro was in custody and that the case "is being prosecuted still. I'm not one hundred percent certain." Officer Keck testified that a second report described an altercation between Monstro and his girlfriend's father during which Monstro struck the victim with a shotgun. A third report concerned a vehicle found in the driveway of another individual who Officer Keck believed to be a member of the Sureño 13 street gang. The vehicle had been stolen out of El Cerrito. Monstro "subsequently was driving the vehicle, was pulled over by San Pablo police department. A firearm was located in the vehicle. . . . [Monstro] was aware it was stolen, and he admitted the firearm was his because he needed it for protection." Officer Keck stated, further, that he believed that Monstro had been convicted in that case. "I know he's just getting out of custody on that case."

■ Defendant cites *Nathaniel C., supra,* 228 Cal.App.3d 990 and *In re Leland D.* (1990) 223 Cal.App.3d 251 [272 Cal.Rptr. 709] (*Leland D.*). In

*Nathaniel C.,* a police officer testified that he had learned from police reports, and apparently from speaking with other officers, that there had been an incident involving the shooting of a person the police believed to be a member of a gang by another person the police also believed to be a member of the gang. The court held that this evidence was plainly insufficient to establish a predicate offense. "The witness offered only nonspecific hearsay of a suspected shooting of one [gang] member by another. The witness, a South San Francisco police officer, had no personal knowledge of the incident and only repeated what San Bruno police told him they believed about the shooting. Such vague, secondhand testimony cannot constitute substantial evidence that the required predicate offense by a gang member occurred. [Citation.] While experts may offer opinions and the reasons for their opinions, they may not under the guise of reasons bring before the trier of fact incompetent hearsay evidence. [Citations.]" (*Nathaniel C., supra,* at pp. 1003–1004.)

In *Leland D., supra,* 223 Cal.App.3d 251, an officer essentially stated his opinion that members of a gang had engaged in crimes, based, apparently, on hearsay statements from unidentified gang members and information pertaining to arrests of purported gang members. There was no evidence as to when the alleged crimes had taken place. The court, while noting that Penal Code section 186.22 does not require proof of convictions, held that the nonspecific hearsay and arrest information fell "far short of what is required to prove 'the commission, attempted commission, or solicitation of two or more of the [statutorily enumerated] offenses' ([Pen. Code,] § 186.22, subd. (e)) within the requisite three-year time period so as to establish that the [street gang] 'engaged in a pattern of criminal activity.' " (223 Cal.App.3d at pp. 259–260.)

Respondent counters by citing *People v. Gardeley,* where the court found sufficient evidence of a predicate offense in an information and other official court records showing that a gang member had been convicted of shooting at an inhabited building. (*People v. Gardeley, supra,* 14 Cal.4th at pp. 624–625.)

The evidence here, while less compelling than that in *People v. Gardeley, supra,* 14 Cal.4th 605, is more compelling than that in *Nathaniel C., supra,* 228 Cal.App.3d 990, or *Leland D., supra,* 223 Cal.App.3d 251, and adequately establishes at least one predicate offense. Unlike the police witness in *Nathaniel C.,* Officer Keck here had personal knowledge that Monstro was a member of the Sureño 13 street gang. The police reports, although hearsay as to Monstro's conduct, were admissible to show that the police were investigating Monstro in connection with the specified crimes. Officer Keck's testimony reasonably demonstrates his personal knowledge that Monstro was being prosecuted for shooting the man looking for his dog. That Monstro was

being prosecuted permits the conclusion that there was significant evidence that he had in fact committed the offense. The evidence, therefore, adequately establishes that Monstro, a member of the Sureño 13 gang, committed a predicate offense within the requisite time period.

We need not decide if Officer Keck's testimony adequately established that Monstro committed a second predicate offense, as a second predicate offense was established either by Victor's commission of the assault against Thomas or Victor's murder of Jorge. (*People v. Gardeley, supra,* 14 Cal.4th at p. 625; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1383 [37 Cal.Rptr.2d 596] [holding that a charged offense can be considered as a predicate offense].) We also do not address respondent's argument that Victor's offenses, and defendant's own offense of acting as an accessory after the fact, could be viewed as separate predicate offenses, on the theory that they should be deemed to have been committed "on separate occasions."

## IV.

## Restitution

Defendant contends he was erroneously ordered to pay restitution to Jorge's family for the costs of his funeral. Defendant points out that no statute mandates restitution in cases such as this, where some other person was the immediate cause of economic loss to the victim or the victim's family, and the defendant's criminal liability was based on conduct taking place only after the loss was sustained.[4] Defendant also points out that since orders for restitution are tools for rehabilitation, there is no justification for ordering a defendant to pay restitution for some other person's conduct, as no rehabilitative purpose can be served by forcing a person to confront tendencies which differ from those which induced his crime. (E.g., *People v. Richards* (1976) 17 Cal.3d 614, 622 [131 Cal.Rptr. 537, 552 P.2d 97]; *People v. Scroggins* (1987) 191 Cal.App.3d 502, 506 [236 Cal.Rptr. 569]; *In re Maxwell C.* (1984) 159 Cal.App.3d 263, 265–266 [205 Cal.Rptr. 310].) Defendant contends, therefore, that there is no justification for ordering him to pay restitution for Victor's conduct.

 That no statute requires restitution in cases such as this does not mean that the court lacked the power to grant it. To the contrary, Penal Code section 1203.1 confers broad power on the courts to impose conditions to

---

[4] Welfare and Institutions Code section 730.6 requires a juvenile court to order a minor to pay restitution to any victims or families of victims who suffered economic loss as a result of the minor's conduct. Similarly, Penal Code section 1202.4, subdivision (f) requires the court to order a defendant to pay restitution to any victim who suffered economic loss as a result of the defendant's conduct.

foster rehabilitation and to protect public safety. (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120 [43 Cal.Rptr. 2d 681, 899 P.2d 67].) This power includes ordering restitution, if such a condition is reasonably related to the crime of which the defendant was convicted or to future criminality. (Pen. Code, § 1203.1, subd. (j); *People v. Carbajal, supra,* at p. 1121.) In addition, while it is still recognized that orders of restitution have rehabilitative purposes, it is now also recognized that such orders have the additional important purpose of preventing the victims of crimes from suffering economic loss. (See Pen. Code, § 1202.4, subd. (a)(1)—enacted after the decisions in *People v. Richards, supra,* 17 Cal.3d 614, *People v. Scroggins, supra,* 191 Cal.App.3d 502, and *In re Maxwell C., supra,* 159 Cal.App.3d 263.)

■ That a defendant was not personally or immediately responsible for the victim's loss does not render an order of restitution improper. To the contrary, "California courts have long interpreted the trial courts' discretion to encompass the ordering of restitution as a condition of probation even when the loss was not necessarily caused by the criminal conduct underlying the conviction. Under certain circumstances, restitution has been found proper where the loss was caused by related conduct not resulting in a conviction [citation], by conduct underlying dismissed and uncharged counts [citation], and by conduct resulting in an acquittal [citation]." (*People v. Carbajal, supra,* 10 Cal.4th at p. 1121.) Again, the question simply is whether the order is reasonably related to the crime of which the defendant was convicted or to future criminality.

It is true that there is little if any rehabilitative purpose in requiring a defendant to pay restitution for loss due to some other person's conduct when the defendant's criminal tendencies were not the same as those that motivated the other person to act. In *In re Maxwell C., supra,* 159 Cal.App.3d 263, cited by defendant, the court found that the defendant's actions in receiving and concealing a stereo stolen from an automobile did not justify an order requiring the defendant to pay restitution for damage to the automobile resulting from securing entry and removing the stereo from the dashboard. (*Id.* at p. 265.) The court there held that "the restitution must be directly related to the crime charged and must relate to acts by the accused which were committed with the same state of mind as the offense of which he was convicted in order that the statutory rehabilitative effect can take place. [Citation.] With minors as well as adults '[n]o rehabilitative purpose can be served by forcing a person to confront tendencies which differ from those which induced his crime. . . .' [Citation.] The state of mind with which burglary or vandalism are committed is different than that required for receiving stolen property." (*Id.* at pp. 265–266.)

■ The Supreme Court, in *People v. Carbajal, supra,* 10 Cal.4th 1114, disapproving *People v. Richards, supra,* 17 Cal.3d 614, cited by the court in

*In re Maxwell C., supra,* 159 Cal.App.3d 263, held that an order of restitution is permitted even if the act for which the defendant is ordered to make restitution was *not* committed with the same state of mind as that required for the crime that proximately caused the loss. It is enough that conditioning probation on a restitution order "would make amends 'to society for the breach of the law, for any injury done to any person resulting from that breach, and generally and specifically for the reformation and rehabilitation of the probationer.' (Pen. Code, § 1203.1, subd. (j).)" (*People v. Carbajal, supra,* at p. 1126.) Where, as here, the defendant has been found to have been promoting and assisting gang conduct, the restitution order serves a rehabilitative purpose by bringing home to the defendant the consequences of his gang membership. Defendant chose to be a member of the Sureño 13 criminal street gang—a gang that has as a main purpose the commission of violent offenses, and that seeks to protect gang members irrespective of the cost to nonmembers and to society. The effect of the order is to make defendant aware of the consequences of his choice by compelling him to share responsibility for the gang-related activities in which he in some way participated. The order also forces defendant to face the emotional and financial effects of gang-related activity on the family of the victim. The restitution order was directly related to defendant's future criminality, and was an appropriate exercise of the trial court's discretion.

Defendant also complains of a denial of due process, noting that the court in *In re Maxwell C.* recognized that "[a] minor cannot be found to have committed an offense neither specifically alleged nor necessarily included in the alleged offense without his consent." (*In re Maxwell C., supra,* 159 Cal.App.3d at p. 266.) Defendant, however, was not convicted of any crime other than being an accessory after the fact. An order of restitution to a victim is not a penal consequence. It therefore has been held, for instance, that a defendant need not be informed of a restitution order as a probation condition before the court accepts a plea of guilty. (*People v. Campbell* (1994) 21 Cal.App.4th 825, 829–830 [26 Cal.Rptr.2d 433].) In *People v. Carbajal, supra,* 10 Cal.4th 1114, the Supreme Court upheld a condition of probation requiring a defendant to pay restitution to the person whose car he damaged in an accident, notwithstanding that the loss might not have been related to the defendant's criminal conduct. (The defendant may not have caused the accident and may not have been civilly responsible for the damage to the other person's car. His criminal liability was based on his conduct in leaving the scene of the accident without giving required information to the other driver.) (*Id.* at pp. 1123–1124.)

Due process requires only that a defendant in such cases be afforded an opportunity to present evidence on the issue of his ability to pay. (*People v. Campbell, supra,* 21 Cal.App.4th at p. 831; *People v. Baumann*

(1985) 176 Cal.App.3d 67, 79–80 [222 Cal.Rptr. 32], discussing and distinguishing *In re Maxwell C.*, *supra*, 159 Cal.App.3d 263.) The court here offered to provide defendant with a restitution hearing. He was entitled to no more.

## Conclusion

The order is affirmed.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied February 15, 2005, and appellant's petition for review by the Supreme Court was denied May 11, 2005. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.