Filed 4/27/22  In re M.R. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re M.R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br>v.<br>M.R.,<br>      Defendant and Appellant. | A162803<br><br>(San Francisco County Super. Ct. No. JW086778) |

Defendant M.R. was tried as an adult and convicted of the murder and robbery of Ivan Miranda, crimes that took place when M.R. was 15 years old. He was sentenced to a prison term of 35 years to life and ordered to pay approximately $100,000 in restitution.  After changes in the law that narrowed the felony murder rule and prohibited the transfer of juveniles under 16 years old to adult court, M.R.'s murder conviction was vacated and his case transferred back to juvenile court, where he was again ordered to pay some $100,000 in restitution.  M.R. argues that the juvenile court lacked jurisdiction to order him to pay restitution and that vacating his murder conviction eliminated the factual basis for the restitution award.  We affirm.

1

# BACKGROUND

In *People v. Aguilera* (Oct. 2, 2015, A140128) 2015 WL 5773296 [nonpub. opn.] (*Aguilera*), we summarized the events of July 30 and 31, 2008, when M.R. was 15 years old, as shown by the evidence at trial as follows:

"[Rony] Aguilera and [M.R.] were members of the MS–13 gang. MS stands for Mara Salvatrucha, a reference to El Salvador; 13 represents MS–13's affiliation with Sureño. On July 30, 2008, the father of MS–13 gang member 'Pistolit[o]' (Pistolit[o]) was shot by a member of the Norteño, a rival gang, and some MS–13 gang members quickly met to plot revenge. The MS–13 members who met included Aguilera, [M.R.], Acosta, Cesar Alvarado ('Momia'), Walter Chinchilla ('Demonio'), and Pistolit[o].

"Some specifics concerning the revenge meeting were confirmed by the testimony of Jose ('Chiqui') Espinal, another MS–13 gang member, who testified in exchange for a letter of recommendation to the federal judge before whom Espinal had pleaded guilty to five charges. Espinal testified that in 2008 Pistolit[o]'s father was shot during a confrontation with rivals who sold fake green cards in the Mission District. When MS–13 gang members learned that Pistolit[o]'s father had been shot, they attributed the shooting to Norteños, and planned to retaliate. Asked how he knew, Espinal testified he was 'there when it was planned.' Sometime after the meeting, Espinal phoned [M.R.] and told him to get ready, as other gang members would come by to pick him up. Espinal himself had to go to work.

"Early the next morning, July 31, at approximately 1:15 a.m., 14–year–old Miranda left his house to meet his 17–year–old friend Linares, telling his father he was going to return Linares's iPod. Miranda met Linares and her friend, Flores, at the intersection of Persia Avenue and Lisbon Street at

2

about 1:30 a.m.  Miranda had red shoelaces in his sneakers, the color associated with the Norteño gang.

"The three of them walked toward Linares's house, when Linares noticed four men approaching.  The men walked past them at first, then turned back and headed toward them.  Flores recognized one of the four men as [M.R.], who went to the same school as he and his companions.  Flores noticed a fifth man who seemed to be texting or calling someone.

"When the four approached, they produced knives, one of them said, 'check them,' and asked whether Miranda and the others had iPods or phones, which they then took.  Two of the men held knives against Flores, one of whom flashed an MS–13 gang sign.  Two others, including [M.R.], pointed knives at Miranda, who broke free and ran, pursued by two gang members.  Moments later, Linares and Flores saw Miranda on the ground, stabbed in the chest, neck, arm, and back.  Miranda was taken to San Francisco General Hospital, where he died from his stab wounds.  The iPod he brought to the scene was never recovered.

"A little after 1:30 a.m., Espinal called [M.R.] and asked him 'what's up.'  [M.R.] said 'a little fish had fallen'—'that long hair little guy from school . . . Ivan Dude.'

"On July 31, the day of the murder, Aguilera contacted Acosta, a fellow gang member who was also a tattoo artist, told him about the murder, said that he and [M.R.] had earned gang tattoos for the murder, and asked him to tattoo them.  Acosta did that.  And much more." (*Aguilera, supra*, 2015 WL 5773296 at pp. *1–*2.)

Acosta made recordings of conversations with M.R. and Aguilera while riding in a car with them the day of the murder and at a tattoo session later

that day.  He later testified at trial and attributed the following statements to M.R.:

"• 'We even hide the knife.'

"[Aguilera interjected: 'We have to go get that shit dog.']

"• [M.R.]: 'Yeah dude because all my fingerprints are on it since I didn't wear gloves.'

"• 'Hey, what made me laughs is how he went down; he even closed his legs, and then dropped dead, like this look! [LAUGHS].'

"Later in the car ride recording, Acosta identified [M.R.] as saying that Linares and Flores, the two people with Miranda the night of his murder, recognized [M.R.] from school, as Flores apparently asked [M.R.], ' "Why are you checking me if I know you?" '  In the car, Acosta asked [M.R.], 'The guy recognized you?,' to which [M.R.] responded, 'Yes, yes, he saw my face . . . we went to school together and we got into a fight once there too.'  Here, Aguilera jumped in to say 'Yeah, I went to school with them too dog.'

"In the second recording, at the house where Acosta tattooed Aguilera and [M.R.], Acosta identified [M.R.] as saying:  'This dude, these dudes fucked up because all they did was take [Miranda's] iPod and slightly stabbed him, and [Flores] recognized me, he is out with the narcs right now.'  [M.R.], Acosta, and Aguilera (along with a few other members of the gang) go on to discuss having someone vouch for their whereabouts the night of the crimes, in order to provide alibis for each of them." (*Aguilera, supra,* 2015 WL 5773296 at p. *5.)

**The Trial and the Appeals**

In 2013, M.R. was tried as an adult along with Aguilera, and the jury found him and Aguilera guilty of the first degree murder of Miranda (Pen. Code, § 187, subd. (a)) (count 1), the robbery of Miranda (Pen. Code, § 211)

4

(count 2), the robbery of Flores (Pen. Code, § 211(a)) (count 3), the attempted robbery of Linares (Pen. Code, §§ 211, 664) (count 4), participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)) (count 5), and conspiracy to commit assault with a deadly weapon (Pen. Code, § 182, subd. (a)(1)) (count 6). The jury also found that all the crimes, except count 5, were committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)). The jury found not true allegations that M.R. had personally used a deadly weapon in connection with counts 1 through 4 (Pen. Code, § 12022, subd. (b)(1)). (*Aguilera, supra*, 2015 WL 5773296 at pp. *1, *6.)

The trial court sentenced M.R. to a term of 35 years to life. (*Aguilera, supra*, 2015 WL 5773296 at p. *7.) The trial court also ordered victim restitution of $103,961.35, owed jointly and severally by M.R. and Aguilera, calculated as follows: $24,579.35 to the victim's compensation board for Miranda's family's mental health and funeral expenses; $61,382 to Miranda's mother for increased rent after she moved, transportation expenses, therapy, childcare, and telephone bills; and $18,000 to Miranda's father for lost wages.

Both defendants appealed the judgment, and we affirmed. (*Aguilera, supra*, 2015 WL 5773296 at pp. *12.) M.R. also separately appealed the restitution order, and we affirmed that as well. (*People v.* [*M.R.*] (Jan. 28, 2016, A142804) 2016 WL 347871 [nonpub. opn.].)

**The Recent Proceedings Below**

In 2019, Senate Bill No. 1437 became effective, limiting the felony murder rule and the natural and probable consequences doctrine such that murder liability may be imposed only on a defendant who was the actual killer, acted with the intent to kill, or was a major participant in the underlying felony who acted with reckless indifference to human life, and set forth a procedure for those convicted under such theories to seek

5

resentencing. M.R. petitioned to have his murder conviction vacated, arguing that he could no longer be convicted of first degree murder under the law as amended.

On December 21, 2020, after an evidentiary hearing, the trial court granted the petition. The trial court concluded that taking the jury's findings as true, the evidence failed to establish beyond a reasonable doubt that M.R. "acted with reckless indifference" toward Miranda's life. The trial court described a first set of reasonable conclusions that could be drawn from the evidence:

"The first set of reasonable conclusions begins with [M.R.]'s fully embracing the plan of his fellow MS-13 gangsters to 'hunt' for one or more Nortenos to carry out a violent revenge killing or serious assault in retaliation for the shooting of Pistolito's relatives. In this set of conclusions, [M.R.] knew that Aguilera and the others were armed with knives and were ready, willing and able to use them to carry out their mission. Drawing all reasonable inferences in favor of the People's case, the first set of reasonable conclusion includes [M.R.]'s identification of Miranda as a Norteno to Aguilera and the other MS-13 gangsters based on [M.R.]'s prior knowledge of Miranda from school. By identifying Miranda as a Norteno, [M.R.] knew that the likely result was the death of or serious injury to Miranda. Accepting the truth of Acosta's testimony about [M.R.], this first reasonable conclusion also includes [M.R.] taking 'credit' for Miranda's murder and receiving a tattoo for doing so."

However, the trial court went on to find that because the evidence at trial and the jury's findings were also consistent with the conclusion that M.R. did not act with reckless indifference to Miranda's life, the People had

6

failed to prove beyond a reasonable doubt that M.R. did so and that therefore his murder conviction must be vacated under Senate Bill No. 1437.

M.R. then sought to have his case remanded to juvenile court pursuant to Proposition 57, which eliminated the transfer of individuals under 16 years of age to adult court. (See *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 305–306.) The prosecution did not oppose the transfer, and on December 30, 2020, the trial court conditionally reversed M.R.'s convictions on counts 2 through 6 and remanded the case to juvenile court.

On January 6, 2021, the juvenile court ordered counts 2 through 6 "converted to adjudicated juvenile offenses as of 7/3/2013." At a further hearing on January 20, the juvenile court concluded that a commitment to the department of juvenile justice (DJJ) would not be appropriate, but ordered M.R. to pay victim restitution.

At the end of the hearing, the following exchange took place:

"THE COURT: So at this time I am terminating jurisdiction of the juvenile court with respect to everything except the issue of victim restitution.

"And, [defense counsel], just to be ultra clear on this, do you stipulate on behalf of your client that the court can continue its jurisdiction for as long as it reasonably takes to address the issue of victim restitution notwithstanding him not being on any other court orders?

"[Defense counsel]: With respect to restitution only, yes."

The juvenile court set a further restitution hearing for March 16.

At that hearing, the juvenile court rejected the argument that the restitution award was no longer supported because the murder conviction had been vacated: "[T]he evidence suggests clearly that Mr. Aguilera and [M.R.] had a particular idea of what they were going to do that night. And

7

that involved criminal conduct and this was the result of that.  It is included in the overall conduct that they decided to partake in.  The results of it do not surprise anyone.

"In fact, and I hate to say it but I'll say it for the record, but it seems it was celebrated.  There is no reason, there is no justice between disconnecting [M.R.] from the conduct of Mr. Aguilera even though those two may be in different positions legally with respect to what convictions they can sustain and whether or not the case is in juvenile court or adult court.  There is no good cause no justice behind treating that situation differently.  So the request to do so, is denied."

The juvenile court reimposed the previous award of $103,961.35 and awarded an additional $5,016.50 for mental health treatment, for a total award of $108,977.85 owed joint and severally by M.R. and Aguilera.

M.R. appealed.

## DISCUSSION

### M.R. is Estopped From Arguing that the Juvenile Court Lacked Jurisdiction

M.R. argues that the juvenile court had no jurisdiction to order him to pay restitution because he was 27 years old at the time of the hearing, and the juvenile court had not previously ordered probation or a term of commitment.  (See Welf. & Inst. Code, § 607, subd. (a)[1] ["The court may retain jurisdiction over a person who is found to be a ward or dependent child of the juvenile court until the ward or dependent child attains 21 years of age"]; § 730.6, subd. (h)(1) ["If the amount of loss cannot be ascertained at the time of sentencing, the restitution order shall include a provision that the

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

8

amount shall be determined at the direction of the court at any time during the term of the commitment or probation"].) We conclude that M.R. is estopped from making this argument.

The relevant law was explained in *People v. Ford* (2015) 61 Cal.4th 282 (*Ford*), where the defendant pleaded guilty to felony hit and run, was placed on probation, and the trial court reserved jurisdiction to determine the amount of restitution. (*Id.* at p. 285.) A restitution hearing was continued several times, sometimes at the defendant's request, and each time with his consent. (*Ibid.*) When the hearing was finally held, defense counsel made a special appearance and contested the court's jurisdiction on the ground that the defendant's term of probation had expired one week earlier. (*Id.* at p. 286.) Citing numerous cases, our Supreme Court concluded that defendant was estopped to contest the court's jurisdiction:

"The doctrine of estoppel to contest jurisdiction may apply to ' "a party who seeks or consents to action beyond the court's power as defined by statute or decisional rule" ' in the period after probation has terminated. ([*In re*] *Bakke* [(1986)] 42 Cal.3d [84,] 89.) Whether the party should be estopped depends on a weighing of equities in the particular case, the effect of estoppel on the functioning of the courts, and considerations of public policy. (*In re Griffin* (1967) 67 Cal.2d 343, 348 (*Griffin*).) In *Griffin*, for example, we held that the habeas corpus petitioner was estopped from challenging an order revoking probation. While the petitioner argued that the order was in excess of jurisdiction, he had himself requested a continuance of the probation revocation hearing to a date beyond the expiration of his probationary term. (*Id.* at pp. 347–349; see *id.* at p. 348 ['[a] litigant who has stipulated to a procedure in excess of jurisdiction may be estopped to question it when "To hold otherwise would permit the parties to trifle with the courts" '].)

9

"We reached a similar conclusion in *Bakke, supra,* 42 Cal.3d 84. The trial court imposed a jail term as a condition of probation but stayed execution of the jail term pending appeal at the habeas corpus petitioner's request. When the probationary term expired before the appeal could be resolved, the petitioner contended that the trial court lacked jurisdiction to order execution of the jail term. We followed the reasoning of *Griffin* and held that the petitioner was estopped from objecting to the execution of the jail term, despite the fact his probation had already terminated. (*Bakke,* at p. 89; see *People v. Jackson* (2005) 134 Cal.App.4th 929, 932–933 [defendant was estopped from challenging court's jurisdiction to impose a probationary term exceeding the statutory maximum by requesting the extension].)

"Defendant in this case did not seek the continuance. But estoppel can also apply to a party who merely consents to a continuance to a date beyond the court's ordinary authority to act. (*Bakke, supra,* 42 Cal.3d at p. 89.) We have long recognized that a failure to object can constitute implied consent to an act in excess of the court's jurisdiction. (*People v. Toro* (1989) 47 Cal.3d 966, 973 [defendant who fails to object to instructions on a lesser related offense 'impliedly consents' to the court's jurisdiction to convict him of the uncharged offense]; *Harrington v. Superior Court* (1924) 194 Cal. 185, 188–189, ['if the court has jurisdiction of the subject matter, . . . a party may voluntarily submit himself to the jurisdiction of the court, or may, *by failing to seasonably object thereto,* waive his right to question jurisdiction' (italics added)]; see generally *Barsamyan v. Appellate Division of Superior Court* (2008) 44 Cal.4th 960, 970 [' "Implied consent is the failure to object" '].) We have also held that a probationer's conduct may signify consent to the continuance of a proceeding, even if the continuance extends the proceedings beyond the period during which a statute requires a court to act. (*Bakke,* at

10

p. 89.)  In the circumstances here, where defendant's own requests played a role in delaying the proceedings and defendant did not object to a continuance of the restitution hearing to a date beyond his probationary term, he can be understood to have consented to the continuance."  (*Ford*, *supra*, 61 Cal.4th at pp. 287–288.)

*Ford* controls this case.  Here, defense counsel did not simply fail to object to the court's jurisdiction or consent to a continuance, but explicitly "stipulated on behalf of [his] client" that "the court can continue its jurisdiction for as long as it reasonably takes to address the issue of victim restitution notwithstanding [M.R.] not being on any other court orders." Counsel could not have been more explicit in waiving the argument M.R. now raises.

M.R. argues that estoppel does not apply because his counsel "did not stipulate to extending the court's jurisdiction to granting restitution that violated Welfare and Institutions Code sections 607, subdivision (a) and 730.6, subdivision (h)(1)."  But this is simply a rephrasing of his argument, because these statutory sections are the basis for M.R.'s contention that the court lacked jurisdiction to order restitution because he was over 21 and because the court did not order commitment or probation—jurisdiction to which his counsel expressly consented.  Indeed, section 730.6, subdivision (h)(1) is the basis for M.R.'s argument that the court lacked jurisdiction because there was no term of commitment or probation—clearly what was meant by the statement that M.R. consented to jurisdiction "notwithstanding [M.R.] not being on any other court orders."

*People v. Waters* (2015) 241 Cal.App.4th 822 (*Waters*), on which M.R. relies, is distinguishable.  There, defendant pleaded no contest to charges of grand theft embezzlement, and was placed on probation without the court

11

ordering restitution.  (*Id*. at p. 825.)  Over two years after probation was completed, defendant filed a petition to reduce the conviction to a misdemeanor, and in response the probation department filed a recommendation for an award of some $20,800 in restitution.  (*Ibid*.)  Defendant first stipulated to the restitution, then later withdrew the stipulation and contested the amount, but never contested the court's jurisdiction.  On appeal from the restitution award, the Court of Appeal held that defendant was not estopped from contesting jurisdiction, distinguishing *Griffin*, *Bakke*, and *Ford* on the grounds that the defendants in those cases either requested or consented to continuances until after the probationary term had expired:

"In contrast, in the instant action, no attempt was made to set a restitution hearing until long after defendant successfully completed her probation.  Defendant only appeared before the court after the expiration of her probation because she sought to dismiss her felony conviction pursuant to [Penal Code] section 1203.4.  Moreover, defendant played no role in delaying the order of restitution." (*Waters*, at p. 831.)

Here, by contrast, M.R.'s counsel expressly consented to the court's jurisdiction.  And the juvenile court promptly set a restitution hearing as soon as the matter was transferred from adult court.

**There Is Sufficient Factual Nexus Between the Restitution Award and the Conduct for which the Juvenile Court Sustained the Petition**

M.R. also argues that vacating his murder conviction eliminated the factual basis for the restitution award.  We disagree.

12

**Applicable Law**

"Enacted in 1982, Proposition 8, the 'Victims' Bill of Rights,' amended the California Constitution to provide that 'all persons who suffer losses' resulting from crime are entitled to 'restitution from the persons convicted of the crimes causing the losses.' (Cal. Const., art. I, § 28, subd. (b)(13)(A).) In 1983, the Legislature enacted Penal Code section 1202.4, which requires a full victim restitution order in criminal cases for every determined economic loss unless there are compelling and extraordinary reasons not to do so. (Pen. Code, § 1202.4, subd. (f).) In 1994, the Legislature enacted section 730.6 to provide 'parallel restitutionary requirements for juvenile offenders.' (*People v. Birkett* (1999) 21 Cal.4th 226, 240, fn. 15.)" (*Luis M. v. Superior Court* (2014) 59 Cal.4th 300, 304 (*Luis M.*).)

Section 730.6, subdivision (h) directs the juvenile court to order restitution "of a dollar amount sufficient to fully reimburse the victim or victims for all determined economic losses incurred as the result of the minor's conduct for which the minor was found to be a person described in Section 602," unless it finds compelling and extraordinary reasons for not doing so.

"An order of direct victim restitution acts to make the victim whole, rehabilitate the minor, and deter future delinquent behavior. (*In re M.W.* (2008) 169 Cal.App.4th 1, 6; accord, *People v. Cookson* (1991) 54 Cal.3d 1091, 1097, and is reviewed for abuse of discretion (*In re Johnny M.* (2002) 100 Cal.App.4th 1128, 1132; accord, *People v. Stanley* (2012) 54 Cal.4th 734, 737) ' "In keeping with the [voters'] 'unequivocal intention' that victim restitution be made, statutory provisions implementing the constitutional directive have been broadly and liberally construed." ' (*Stanley*, *supra*, at

13

p. 737, quoting *People v. Lyon* (1996) 49 Cal.App.4th 1521, 1525.)" (*Luis M.*, *supra,* 59 Cal.4th at p. 305.)

"While the court need not ascertain the exact dollar amount of the [victim]'s losses (*In re Brittany L.* [(2002)] 99 Cal.App.4th [1381,] 1391), its calculation under section 730.6 must have some factual nexus to the damage caused by the minor's conduct." (*Luis M.*, *supra,* 59 Cal.4th at p. 309; see *ibid.* [court must provide a "rational estimate of costs occasioned by [defendant]'s conduct"].)

And in discussing the trial court's discretion to order restitution as a condition of probation, our Supreme Court explained in *People v. Carbajal* (1995) 10 Cal.4th 1114, 1121: "California courts have long interpreted the trial courts' discretion to encompass the ordering of restitution as a condition of probation even when the loss was not necessarily caused by the criminal conduct underlying the conviction. Under certain circumstances, restitution has been found proper where the loss was caused by related conduct not resulting in a conviction (*People v. Miller* [(1967)] 256 Cal.App.2d [348,] 355–356), by conduct underlying dismissed and uncharged counts (*People v. Goulart* (1990) 224 Cal.App.3d 71, 79), and by conduct resulting in an acquittal (*People v. Lent* [(1975)] 15 Cal.3d [481,] 483). There is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action. (See *In re Brian S.* (1982) 130 Cal.App.3d 523, 528–532, 534, fn. 4.)"

**Analysis**

The juvenile court did not abuse its discretion in finding a sufficient "factual nexus" between the conduct forming the basis of M.R.'s offenses—not including the murder—and the costs resulting from Miranda's death.

14

According to the evidence at trial, M.R. was a member of the MS-13 gang and participated in a meeting with other gang members where they planned revenge against the Norteños for the shooting of an MS-13 gang member's father. Early the next morning, M.R. and three other gang members stopped Miranda, who was wearing red shoelaces, the color associated with the Norteño gang. The men produced knives and robbed Miranda, during which robbery one of the men flashed an MS-13 gang sign. When Miranda ran away, Aguilera chased him and stabbed him to death.[2] Afterwards, M.R. laughed about Miranda's death and got a tattoo to commemorate the murder. In connection with all the above, M.R. was convicted of participation in a criminal street gang, Miranda's robbery, and conspiracy to commit assault with a deadly weapon, and the jury found true the enhancement that the latter two offenses were committed to benefit a criminal street gang. Furthermore, according to the trial court, one reasonable view of the evidence was that M.R. "fully embrac[ed] the plan of his fellow MS-13 gangsters to 'hunt' for one-or more Nortenos to carry out a violent revenge killing or serious assault in retaliation for the shooting of Pistolito's relatives," and he "identifi[ed] Miranda as a Norteno to Aguilera and the other MS-13 gangsters based on [M.R.]'s prior knowledge of Miranda from school," knowing that "the likely result was the death of or serious injury to Miranda." Under these circumstances, the conduct for which M.R. was convicted had a sufficient "factual nexus" to Miranda's murder and the resulting costs to support the trial court's restitution award.

---

[2] The trial court's written decision granting M.R.'s petition describes certain critical jury findings, including that in the course of taking Miranda's iPod, Aguilera stabbed Miranda through the neck and the heart.

*In re I.M.* (2005) 125 Cal.App.4th 1195 (*I.M.*) is instructive. There, I.M. and his codefendant approached the victim and a friend and confronted them, after which confrontation I.M.'s codefendant drew a gun and shot the victim, *id*. at pp. 1199–1200, and then handed the gun to I.M., who ran away with it. (*Id*. at p. 1201.) A section 602 petition charged I.M. with acting as an accessory after the fact to murder (Pen. Code, § 32), with an enhancement based on the allegation that he committed the offense to benefit a criminal street gang. (Pen. Code, § 186.22, subd. (b)(1).) The juvenile court found the petition's allegations to be true, and as a condition of probation, ordered I.M. to pay some $15,000 for the victim's funeral. (*Id*. at p. 1199.) I.M. challenged the restitution award on the ground that his codefendant had caused the loss and his liability was based entirely on conduct that took place after the murder occurred. (*Id*. at p. 1208.) The Court of Appeal disagreed and affirmed the award:

"Where, as here, the defendant has been found to have been promoting and assisting gang conduct, the restitution order serves a rehabilitative purpose by bringing home to the defendant the consequences of his gang membership. Defendant chose to be a member of the Sureño 13 criminal street gang—a gang that has as a main purpose the commission of violent offenses, and that seeks to protect gang members irrespective of the cost to nonmembers and to society. The effect of the order is to make defendant aware of the consequences of his choice by compelling him to share responsibility for the gang-related activities in which he in some way participated. The order also forces defendant to face the emotional and financial effects of gang-related activity on the family of the victim. The restitution order was directly related to defendant's future criminality, and

16

was an appropriate exercise of the trial court's discretion." (*In re I.M.*, *supra*, 125 Cal.App.4th at p. 1210.)

So too here. M.R. was likewise found guilty of promoting and assisting gang conduct, and the restitution order served the rehabilitative purposes of "bringing home to the defendant the consequences of his gang membership," "mak[ing] [him] aware of the consequences of his choice by compelling him to share responsibility for the gang-related activities in which he in some way participated," and "forc[ing him] to face the emotional and financial effects of gang-related activity on the family of the victim." (*I.M.*, *supra*, 125 Cal.App.4th at p. 1210; see *Luis M.*, *supra*, 59 Cal.4th at p. 305 [restitution serves to "rehabilitate the minor" and "deter future delinquent behavior"].)

## DISPOSITION

The order is affirmed.

_____

Richman, Acting P.J.

We concur:

_____

Stewart, J.

_____

Miller, J.

*In re M.R.* (A162803)